## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| EQUITABLE NATIONAL LIFE INSURANCE COMPANY, INC., a Utah corporation, and EQUITABLE LIFE & CASUALTY INSURANCE COMPANY, a Utah corporation,<br><br>      Plaintiffs,<br><br>v.<br><br>AXA EQUITABLE LIFE INSURANCE COMPANY, a New York company; AXA, S.A., a French joint stock company; and AXA EQUITABLE HOLDINGS, INC., a Delaware corporation,<br><br>      Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>2:19-cv-644-RJS-DBP<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Dustin B. Pead |

AXA Equitable Life Insurance Company wants to change its name. It chose Equitable Financial Life Insurance Company—a name rooted in its history—and planned a roll-out for January 2020. But it faced an obstacle. Equitable Life and Casualty Insurance Company, a much smaller but growing annuities business, already operates under a similar name. After the parties failed to reach a co-existence agreement, this litigation ensued.

The case concerns a trademark dispute between Plaintiffs Equitable National Life Insurance Company, Inc. and Equitable Life & Casualty Insurance Company (collectively, Equitable) on the one hand and Defendants AXA Equitable Life Insurance Company and AXA Equitable Holdings, Inc (collectively, AXA) on the other. Before the court is Equitable's Motion for a Temporary Restraining Order and Preliminary Injunction to enjoin AXA from (1) changing

its name to "Equitable" or "Equitable Life Insurance Company" and (2) using the "EQUITABLE" mark or other "EQUITABLE"-formative marks without the AXA prefix.[1]

"Preliminary injunctions are, by their nature, products of an expedited process often based upon an underdeveloped and incomplete evidentiary record."[2]  This case is no different and presents a close call.  Having considered and applied the relevant standards, and for the reasons explained below, the court grants Equitable's Motion.  However, the court temporarily stays its Order to afford AXA the opportunity to pursue an expedited appeal.

## BACKGROUND

The following facts are drawn from the parties' papers and evidence submitted in advance of the injunction hearing as well as from the representations made during oral argument.  These facts are largely undisputed by the parties.

### I.      AXA's Origins and Brand History

AXA Equitable Life Insurance Company is a leading insurance and financial services provider.[3]  It offers retirement savings, employee benefits, and financial protection products such as life insurance and variable annuities.[4]  Originally founded in 1859 as "The Equitable Life Assurance Society of the United States," the company quickly became known simply as "The Equitable."[5]  It registered for the design mark "EQUITABLE" in 1963 and the design mark "THE EQUITABLE" in 1991, which it regularly incorporated into its marketing materials:[6]

---

[1] Dkt. 39, Equitable's Motion for a Temporary Restraining Order and Preliminary Injunction (Inj. Mot.).

[2] *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1171 (11th Cir. 2002) (citation omitted).

[3] Dkt. 53, Opposition to Equitable's Inj. Mot. (Opp'n) at 4.

[4] *Id.*

[5] *Id.* at 3.

[6] Dkt. 39 (Inj. Mot.) at 5; Dkt. 53 (Opp'n), Ferrero Decl. ¶ 49.



**Logo Beginning Circa 2000**

Later in 1991, AXA S.A.—a French company—obtained majority control of The Equitable.[7]  Although the name remained unchanged for several years, AXA chose not to renew its registration of the mark "THE EQUITABLE," and the registration was canceled in 2003.[8]  It also failed to renew its registration for the mark "EQUITABLE," which was canceled in 2004.[9]  On September 7, 2004, The Equitable Life Assurance Society of the United States was renamed AXA Equitable Life Insurance Company.[10]  This was reflected in another update of the company's logo:[11]



**Logo Beginning Circa 2004**

---

[7] Dkt. 53 (Opp'n) at 4.

[8] Dkt. 39 (Inj. Mot.) at 5.

[9] *Id.* at 5–6.

[10] *Id.* at 6, 19.

[11] Ferrero Decl. ¶ 49.

In 2014, AXA Equitable Life Insurance Company simplified its brand name to AXA to improve name recognition.[12]  AXA spent approximately $85 million on its re-branding.[13] Consistent with its shortened name, AXA introduced a new logo: [14]

**Logo Beginning Circa 2014**



In 2017, AXA S.A. announced its intention to sell its interest in AXA, and by March 2019 it owned less than a 10% stake.[15]  AXA S.A. also terminated the trademark license that allowed AXA to use its name.[16]  AXA was given 18 months—or until around September 2020— to remove the "AXA" prefix from its name.[17]  Rather than replace "AXA" with a different prefix, AXA elected to rename as "Equitable."[18]

Starting in May 2018, AXA began taking steps to implement its name change:

- July 2018: AXA filed trademark applications for various "EQUITABLE"-formative marks.[19]

---

[12] *See* Dkt. 40 (Sefick Decl.), Ex. 2.

[13] *Id.*

[14] Ferrero Decl. ¶ 49.

[15] Dkt. 53 (Opp'n) at 5.

[16] *Id.*

[17] *Id.*  There appear to be some exceptions in the agreement that would permit AXA to extend the use of the "AXA" prefix.  *See* Ferrero Decl. ¶ 53 ("Under the agreement, [AXA] has 18 months from termination (*i.e.*, until September 2020) to complete its cessation of use of 'AXA.' That period can be extended only if a regulator does not provide necessary approvals within that 18-month period, which EQH does not anticipate.").

[18] Dkt. 53 (Opp'n) at 5.

[19] *Id.*, Farrelly Decl. ¶ 6.

- December 2018–January 2019: AXA filed for additional "EQUITABLE" logos and marks:[20]

|  | 88/217,938 | December 5, 2018 |
|---|---|---|
|  | 88/217,966 | December 5, 2018 |
|  | 88/217,971 | December 5, 2018 |
|  | 88/217,974 | December 5, 2018 |
|  | 88/217,979 | December 5, 2018 |

- February 2019: AXA's counsel reached out to Equitable's trademark counsel to discuss a potential co-existence agreement.[21]

---

[20] *Id.* As discussed *infra*, all of AXA's "EQUITABLE"-related trademark applications have been preliminarily denied. *Id.* ¶ 9.

[21] *Id.* ¶ 21.

- March 2019: AXA started the process for obtaining regulatory approval for its new name—"Equitable Financial Life Insurance Company"—from state insurance and federal securities regulators.[22]

- May 2019: AXA selected January 2020 to start using its EQUITABLE brand on consumer-facing materials.[23]

- September 4, 2019: AXA presented its plan to change its name at a conference attended by one of Equitable's representatives.[24]

- December 2, 2019: AXA sent the following announcement to over 211,000 financial advisors throughout the country: "On January 14, 2020, we'll announce our name is Equitable — with a clean and modern look to reflect our brand."[25]

## II. Development of Equitable's Brand

In 1938, Equitable changed its name from Equitable Mutual Life Insurance Company of Utah to Equitable Life & Casualty Insurance Company.[26] For most of its existence, Equitable primarily sold life insurance, long-term care insurance, and Medicare supplemental insurance products.[27] Equitable continues to provide support to policy holders of these products, but it no longer sells them.[28] Instead, Equitable spent the last three years moving into the annuities space, allocating 8% of its total budget on advertising and branding in support of the change.[29] Wink's

---

[22] Dkt. 53 (Opp'n) at 6.

[23] *Id.*

[24] *Id.* at 7.

[25] *Id.*

[26] Dkt. 33 (Am. Compl.) ¶ 17.

[27] Dkt. 39 (Inj. Mot.) at 7.

[28] *See* Dkt. 42 (Acker Decl.) ¶ 14.

[29] Dkt. 39 (Inj. Mot.) at 7.

2019 Sales & Market Report ranked Equitable 31ˢᵗ nationally in sales of deferred annuities products with over $900 million in sales.[30]

Throughout its more than 80 years in business, Equitable has continually employed the mark "EQUITABLE" with its financial services products.[31]  While Equitable's mark has varied through the years, the most recent iterations include:


[32]


[33]


[34]

In early 2017, Equitable Life & Casualty Insurance Company acquired American Phoenix Life & Reassurance Co,[35] which Equitable renamed Equitable National Life Insurance Company.[36]  Equitable National also displays the "EQUITABLE" mark on its website:

---

[30] *Id.* at 7–8; Acker Decl., Ex. 5 at 3.  That same report ranked AXA 5th.  *Id.*

[31] Dkt. 39 (Inj. Mot.) at 3; Acker Decl. ¶¶ 25–33.

[32] Acker Decl. ¶ 29.

[33] *Id.* ¶ 30.

[34] *Id.* ¶ 31.

[35] Dkt. 39 (Inj. Mot.) at 5.

[36] *Id.*



### III. The Parties' Dueling Trademark Registration Applications and Failed Attempt to Reach a Co-existence Agreement

In October 2017 Equitable National applied to register the mark "EQUITABLE NATIONAL LIFE INSURANCE COMPANY," but the United States Patent and Trade Office (USPTO) denied Equitable National's application in February 2018.[38] Equitable National's application was denied because of a likelihood of confusion with AXA's registered mark, "AXA AXA EQUITABLE REDEFINING / STANDARDS."[39]

From July 2018 through January 2019, AXA registered for various "EQUITABLE"-related marks, but each of those applications was preliminarily denied on the ground of likelihood of confusion with Equitable National's prior application for "EQUITABLE NATIONAL LIFE INSURANCE COMPANY."[40] In effect, the parties' respective applications blocked each other's potential registration.[41]

In February 2019, AXA's counsel contacted Equitable about negotiating a co-existence agreement.[42] The parties exchanged two draft agreements during the spring and summer of 2019, but neither was finalized.[43] Equitable began to lose confidence in the parties' negotiations,

---

[37] Acker Decl. ¶ 32.

[38] Dkt. 33 (Am. Compl.) ¶ 32. Equitable National has appealed the Examining Attorney's decision, and the appeal is currently pending before the Trademark Trial and Appeal Board. *Id.*

[39] *Id.*

[40] Farrelly Decl. ¶ 9.

[41] *See id.* ¶ 11 ("The parties' applications all are essentially in abeyance in light of this lawsuit."). At oral argument, the parties informed the court that the proceedings before the USPTO concerning their respective trademark registration applications have been stayed pending the resolution of this action.

[42] Dkt. 39 (Inj. Mot.) at 8.

[43] *See* Farrelly Decl. ¶¶ 24, 32.

which was compounded by AXA's announcement on September 4, 2019, that AXA would be dropping the mark "AXA" from its name and rebranding as Equitable within 18 months.[44] Equitable broke off the co-existence negotiations the next day.

## IV.    Procedural History

Equitable filed its Complaint on September 12, 2019, seeking three declaratory judgments related to use of the "EQUITABLE" mark.[45]  AXA moved to dismiss,[46] and Equitable amended its Complaint on October 31, 2019, to include claims for trademark infringement.[47] Upon learning on December 2, 2019, of AXA's plan to publicly announce its new name of "Equitable" on January 14, 2020, Equitable filed on December 19, 2019, its Preliminary Injunction Motion seeking to preserve the *status quo* pending resolution of its claims.  The court set an expedited briefing schedule and held on January 15, 2020, a hearing on Equitable's Motion.

The court initially planned to hear and decide the Motion before AXA's scheduled January 14 name change, but this would have prevented AXA's preferred counsel from arguing the Motion.  To accommodate AXA's counsel, the court agreed to hold the hearing one day after AXA's scheduled announcement.  In so doing, the court clarified that, if AXA chose to proceed with its roll-out on January 14, the court would not consider the announcement in its injunction analysis.  Thus, the status quo between the parties for purposes of the preliminary injunction remains as though the announcement has not yet taken place.

---

[44] Dkt. 39 (Inj. Mot.) at 8.

[45] Dkt. 2.

[46] Dkt. 20.

[47] *See* Dkt. 33 (Am. Compl.).  AXA also moved to dismiss the Amended Complaint but later withdrew that motion. *See* Dkt. 51.

Shortly before the hearing, Equitable filed a motion for leave to file late two rebuttal declarations.[48] Equitable failed to demonstrate that its neglect in not timely filing the declarations was excusable, and its motion is denied.[49] The court did not consider the declarations in reaching its decision.

At the hearing, the parties sought clarification about whether the hearing was for a temporary restraining order or a preliminary injunction.[50] Because both parties briefed the issues and submitted evidence, and at the urging of the parties, the court considers the hearing as one in support of a motion for a preliminary injunction.

## LEGAL STANDARD

To obtain a preliminary injunction, the requesting party must demonstrate four well-established factors: "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest."[51] A temporary restraining order is an extraordinary remedy that may be awarded only if the right to relief is "clear and unequivocal."[52]

Equitable contends a more lenient standard applies on the first factor when the moving party satisfies the remaining three factors.[53] In contrast, AXA maintains a *heightened* standard

---

[48] Dkt. 62.

[49] *See* Fed. R. Civ. P. 6(b)(1)(B) ("When an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect.").

[50] Equitable's Motion requested both.

[51] *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (quoting *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002)).

[52] *Id.*

[53] *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246–47 (10th Cir. 2001).

applies here because Equitable seeks the same relief it could recover after a full trial on the merits. The court declines each party's invitation to deviate from the standard four-part test enunciated above.

The lenient standard Equitable advocates for does not apply because the Tenth Circuit recently disavowed its prior practice of relaxing under certain circumstances the first prong of the preliminary injunction test.[54] But neither does the heightened standard urged by AXA apply. Movants face a heavier burden when seeking a "disfavored" injunction—(1) one that mandates action, (2) changes the status quo, or (3) grants all the relief the moving party could expect from a trial win.[55] AXA argues the injunction Equitable seeks fits into the third category "because they seek the same relief that they may recover after a full trial on the merits—an order enjoining [AXA] from using EQUITABLE without the 'AXA' prefix."[56] An injunction "grants all the relief that the moving party could expect from a trial win" if "the effect of the order, once complied with, cannot be undone."[57] On the other hand, if the court "probably can put the toothpaste back in the tube," then the heightened standard does not apply.[58]

Here, Equitable asks only for an order that temporarily enjoins AXA's name change until the court can fully resolve Equitable's action for a permanent injunction. Thus, granting Equitable's motion would not afford Equitable all the relief it could expect from a trial win. Instead, it would grant Equitable only temporary relief. The possibility of AXA prevailing at

---

[54] *See Diné*, 839 F.3d at 1282 ("[A]ny modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible.").

[55] *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019).

[56] Dkt. 53 (Opp'n) at 9.

[57] *Prairie Band of Potawatomi Indians*, 253 F.3d at 1247.

[58] *Free the Nipple*, 916 F.3d at 798 n.3.

trial would remain, at which point AXA could move forward with its desired name change. Accordingly, the heightened standard does not apply here.

## ANALYSIS

Equitable asserts six causes of action against AXA. Equitable's Motion, however, implicates only the first two: trademark infringement under the Lanham Act (15 U.S.C. § 1125), and trademark infringement under common law and Utah Code § 70-3a-402. On these bases, Equitable seeks a preliminary injunction enjoining AXA from (1) changing its name to "Equitable Life Insurance Company" as scheduled for January 14, 2020, and (2) using the "EQUITABLE" mark or other "EQUITABLE"-formative marks without the AXA prefix. As to its second request, Equitable later clarified, "Equitable's position is not that AXA cannot replace the 'AXA' prefix with some other mark and keep 'Equitable' in its name, rather, Equitable's position is that AXA cannot . . . drop[] its prefix altogether."[59] The court therefore confines its analysis to whether Equitable satisfies the preliminary injunction standard for its trademark infringement claims.

### I.      Likelihood of Success on the Merits

To succeed on its claim for trademark infringement under the Lanham Act, Equitable must demonstrate (1) it has a protectable mark; (2) AXA used Equitable's trademark in connection with any goods or services; and (3) AXA's use creates a likelihood of confusion.[60] Of these factors, "the central inquiry" is the likelihood of consumer confusion.[61]

---

[59] Dkt. 57 (Reply) at 14.

[60] *See Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008) (internal citations and quotation marks omitted). These same elements must be shown to establish a claim for common law trademark infringement. *See Skullcandy, Inc. v. Filter USA, Inc.*, No. 2:18-cv-748, 2019 WL 2568010, at *4 (D. Utah June 21, 2019) (citing *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1219 (10th Cir. 2004)). Accordingly, the likelihood of success analysis is the same for both claims.

[61] *Beltronics USA, Inc. v. Midwest Inventory Dist., LLC*, 562 F.3d 1067, 1071 (10th Cir. 2009).

## A.  Protectability of Equitable's Mark

The court concludes Equitable is likely to succeed in proving it possesses a protectable

trademark.  As a suggestive mark, "EQUITABLE" is due significant protection, and Equitable

became the senior user of the "EQUITABLE" mark after AXA abandoned it.

### 1.  *Type of Mark*

Five categories of terms exist to assess the protection of a mark: generic, descriptive,

suggestive, arbitrary, and fanciful.[62]  Here, the parties dispute whether "EQUITABLE" is

descriptive, suggestive, or arbitrary.  "A mark is descriptive if it describes the product's or

service's features, qualities, or ingredients in ordinary language or describes the use to which the

product or service is put."[63]  *Donchez* further explains:

> A descriptive mark may be eligible for protection, but only if it has acquired a
> secondary meaning in the minds of the public.  Fanciful (made-up words
> expressly coined to serve as trade or service marks), arbitrary (common words
> applied in unfamiliar ways), and suggestive marks (words that connote, rather
> than describe, some quality or characteristic of a product or service) are inherently
> distinctive, and thus receive the greatest protection against infringement.[64]

AXA argues "EQUITABLE" is a descriptive mark, which can receive protection only if

it has acquired secondary meaning.  Most of AXA's argument on this point invokes Equitable's

own representations to the USPTO that "EQUITABLE" is a descriptive mark.[65]  AXA's

argument fails for two reasons.

First, whatever Equitable may have argued in prior USPTO proceedings, the USPTO

disagreed and instead determined that "EQUITABLE" is an arbitrary mark.[66]  The USPTO's

---

[62] *See Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1216 (10th Cir. 2004).

[63] *Id.*

[64] *Id* (internal quotation marks and citations omitted).

[65] Dkt. 53 (Opp'n) at 10–11.

[66] Dkt. 60, Sefick Reply Decl., Ex. 1 at 2.

independent determination is helpful to the court's assessment. Second, although AXA quotes Equitable's mostly conclusory assertions about why "EQUITABLE" is a descriptive mark, AXA fails to advance its own theory explaining why "EQUITABLE" is descriptive. On its own, the word "equitable" hardly describes life insurance or annuities. "Equitable" connotes fairness or justice—but these words could be associated with myriad products or industries. While the court disagrees with the USPTO's determination the mark is arbitrary, it is at least suggestive—that is, it "connote[s], rather than describe[s], some quality or characteristic of a product or service."[67] Because suggestive marks "are inherently distinctive," they "receive the greatest protection against infringement."[68]

### 2. *Seniority and Abandonment*

AXA also argues Plaintiffs cannot show success on the merits because AXA is the senior user of "Equitable" and thus has priority in the mark.[69] Indeed, "[t]he first to use a mark is deemed the 'senior' user and has the right to enjoin 'junior' users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion."[70]

Equitable does not dispute that AXA was the first to use the "EQUITABLE" mark. Rather, Equitable contends it became the senior user once AXA abandoned its use of "EQUITABLE" as a stand-alone mark.[71] Section 1127 of the Lanham Act states:

> A mark shall be deemed to be 'abandoned' . . . [w]hen its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. 'Use' of a mark means the bona fide use of such mark

---

[67] *Donchez*, 392 F.3d at 1216.

[68] *Id.*

[69] *See* Dkt. 53 (Opp'n) at 26–27.

[70] *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999).

[71] Dkt. 39 (Inj. Mot.) at 19.

made in the ordinary course of trade, and not made merely to reserve a right in a mark.[72]

Thus, a party seeking to show that a mark owner has abandoned the mark must show both (1) discontinued use and (2) the intent not to resume using the mark.[73]  Nonuse for three consecutive years establishes a *prima facie* case of abandonment.[74]

Equitable submits it must prove that AXA abandoned its mark by a preponderance of the evidence.[75]  Though not addressed in its Opposition, AXA contended at oral argument that Equitable must prove abandonment by the more strict "clear and convincing" standard.  It appears to the court—on an admittedly expedited review—that the Tenth Circuit has not yet spoken on this question, and other federal circuit courts disagree about the governing standard.[76]  But the court need not decide this issue because it concludes Equitable is likely to succeed in proving abandonment under either standard.

### a.   Nonuse

"'Use' of a mark means the bona fide use of such mark made in the ordinary course of trade."[77]  In contrast, "mere token use" of a mark does not constitute use under the Lanham

---

[72] 15 U.S.C. § 1127.

[73] *See Intrawest Fin. Corp. v. W. Nat. Bank of Denver*, 610 F. Supp. 950, 958 (D. Colo. 1985).

[74] *See Oklahoma Beverage Co. v. Dr. Pepper Love Bottling Co.*, 565 F.2d 629, 632 (10th Cir. 1977) (holding that nonuse for two consecutive years established a prima facie case of abandonment based on an earlier version of the Lanham Act).

[75] Dkt. 39 at 19 (citing *Specht v. Google*, 758 F. Supp. 2d 570, 587 (N.D. Ill. 2010)).

[76] *Compare Emergency One, Inc. v. Am. FireEagle, Ltd.*, 228 F.3d 531, 536 (4th Cir.2000) (applying preponderance of the evidence standard); *Roulo v. Russ Berrie & Co., Inc.*, 886 F.2d 931, 938 (7th Cir.1989) (same); *Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.*, 892 F.2d 1021, 1023–24 (Fed.Cir.1989) (same) *with Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1177 (11th Cir. 2002) (approving district court's application of "strict" standard); *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2nd Cir. 1980) (holding abandonment should be "strictly proved").  For its part, the Ninth Circuit has not settled on a standard.  *See Grocery Outlet Inc. v. Albertson's Inc.*, 497 F.3d 949, 952–54 (9th Cir. 2007) (concurring judges split on whether the test is "clear and convincing" or "preponderance of the evidence").

[77] 15 U.S.C. § 1127.

Act.[78]  Thus, "limited use of a famous trademark solely for protective purposes" is insufficient to preclude abandonment.[79]

Equitable argues AXA abandoned the "EQUITABLE" mark as early as mid-2003, and, at the very latest, in early 2014.  On August 23, 2003, AXA allowed its registration of the mark "THE EQUITABLE" to expire.  As a result, the mark was canceled.  On September 7, 2004, The Equitable Life Assurance Society of the United States changed its name to AXA Equitable Life Insurance Company.  Then, on November 20, 2004, AXA also allowed its registration of the mark "EQUITABLE" to expire, and it was also canceled as a result.  This coincided with a significant revamp of AXA's logo.  In 2000, AXA's logo continued the company's association with Athena:[80]



But following AXA's 2004 name change, the logo was redone:[81]



[78] *Emergency One, Inc.*, 228 F.3d at 536.

[79] *Intrawest Fin. Corp.*, 610 F. Supp. at 959 (citing *Exxon Corp. v. Humble Expl. Co., Inc.*, 695 F.2d 96 (5th Cir.1983)).

[80] Ferrero Decl. ¶ 49.

[81] *Id.*

Ten years later, apparently not content with its level of consumer recognition, AXA took "an ax to its name, trimming it to Axa so it will conform in the United States with the French-based company's brand elsewhere."[82]  All told, AXA dedicated around $85 million to its campaign to rebrand from "AXA Equitable" to simply "AXA."[83]  As part of the campaign, AXA introduced yet another logo, now dropping "EQUITABLE" from the image entirely:[84]

**Logo Beginning Circa 2014**



At the same time, AXA removed from its website any reference to "EQUITABLE" as a stand-alone mark.  Instead, "AXA" displayed prominently at the top of the page.[85]

AXA nevertheless responds that Equitable cannot show abandonment because AXA "never stopped using 'Equitable' without the 'AXA' prefix altogether."[86]  In support, AXA cites paragraphs 32, 36, 40–41, 43, and 47 of the Ferrero Declaration.  These references are unavailing.  Paragraph 32 contains images of the "EQUITABLE" mark pre-2004 (*i.e.*, not the relevant time period for the court's abandonment analysis), and none of the images in paragraph 36 contain "EQUITABLE" without "AXA."  Paragraph 43 appears at least slightly misleading: it shows a picture of a poster board clearly displaying "EQUITABLE" that was used in 2016 to promote the 40th anniversary of AXA introducing variable life insurance products to the market.

---

[82] Sefick Decl., Ex. 2.

[83] *Id.*

[84] Ferrero Decl. ¶ 49.

[85] Dkt. 39 (Inj. Mot.) at 20.

[86] Dkt. 53 (Opp'n) at 26.

But in paragraph 46 it becomes apparent the poster was originally created in 1976. And in paragraph 47, the declarant merely concludes that AXA never stopped using the word "Equitable."

This leaves the contents of paragraphs 40 and 41 of the Ferrero Declaration. Paragraph 40 refers to a pamphlet circulated "from in or around 2015 to 2017" listing products sold by AXA at some point in its history, some of which include the word "Equitable." But the pamphlet is an offer to term policy owners to convert their old policies into "new cash value policies"—it does not indicate AXA still sells these old policies, and the evidence indicates AXA does not.[87] Finally, paragraph 41 asserts "[o]ver a million [AXA] clients currently hold these EQUITABLE-branded products" and continue to see them on their account statements, in correspondence, and occasionally on a deduction from a paycheck.

These examples are insufficient to prove AXA has used the "EQUITABLE" mark in the marketplace. AXA has not sold any products (or promoted any services) using the "EQUITABLE" mark alone since 2014 at the latest. Sending customers account statements that include references to policies previously sold under the "EQUITABLE" mark does not rise to the level of bona fide use. Rather, AXA has described only "token" use courts find insufficient to preclude abandonment.

Nor are the cases AXA cites helpful to its argument. In *Cumulus Media*, the Eleventh Circuit held a radio station had not abandoned its mark, "The Breeze," despite changing its name to "Star 98" because "The Breeze" logo remained on a large outdoor sign at its headquarters as well as on business cards and other promotional materials.[88] But there, the infringer renamed its

---

[87] Dkt. 59, Denton Reply Decl. ¶¶ 19–20.

[88] 304 F.3d at 1177.

radio station "The Breeze" just thirteen months after the plaintiff changed its name, and the

lower court found the infringer's use "had been calculated to mislead substantial numbers of . . .

radio listeners into believing that [the infringer's] 'The Breeze' was a continuation of (or

somehow affiliated with) [the plaintiff's] 'The Breeze.'"[89]  In contrast, Equitable was already

operating under the "EQUITABLE" mark for several decades before AXA abandoned it.

Moreover, AXA has not put forward evidence that it has employed the "EQUITABLE" mark

(alone, divorced from "AXA") on promotional, marketing, or advertising materials that would

continue the public's association with it like those in *Cumulus Media*.

     *Bishop v. Equinox International Corporation* is also inapposite.[90]  In that case, the Tenth

Circuit affirmed the district court's conclusion that the maker of a drink called "The Essence of

Life" had not abandoned its mark during the alleged period of nonuse because it continued to sell

98 bottles a year.[91]  Unlike the plaintiff in *Bishop*, however, AXA has not made *any* annuity sales

under the "EQUITABLE" mark for many years.  That AXA continues to derive revenue from

policyholders who previously bought policies bearing the "EQUITABLE" mark is not the same

as actively employing the mark to help generate new sales.  As one court summarized:

> The concept that goodwill is built up within a mark is one of the main tenants
> upon which trademark law is based.  A mark becomes protectible upon use
> because goodwill generally accumulates in a mark through a mark's use in
> commerce.  It is the goodwill behind the mark that the Lanham Act protects.
> Once the goodwill in a mark has disappeared by non-use of the business[]
> symbolized by the mark, the mark is no longer protectible because there is no
> goodwill left to protect.[92]

---

[89] *Id.* at 1169–70.

[90] 154 F.3d 1220 (10th Cir. 1998).

[91] *Id.* at 1222.

[92] *MB Fin. Bank, N.A. v. MB Real Estate Servs., L.L.C.*, No. 02 C 5925, 2003 WL 21462501, at *10 (N.D. Ill June
23, 2003) (citations omitted).

AXA's final argument is that abandonment does not occur where the public continues to associate the mark with the party defending against a claim of abandonment. As an initial matter, AXA cites no binding authority for its theory. Moreover, the principal case AXA relies on, *Seidelmann Yachts, Inc. v. Pace Yacht Corp.*, is unhelpful.[93] In *Seidelmann*, the Fourth Circuit held the plaintiff did not abandon its "PACEMAKER" mark despite not using it for approximately five years.[94] The court's decision, however, related to the "intent" element of the abandonment analysis. Because the nonuse was "due to financial problems," the court determined there was no intent to abandon the mark.[95] In other words, *Seidelmann* does not bear on the nonuse prong of the abandonment analysis.

Considering all the parties' arguments and evidence, the court concludes the clock on AXA's period of nonuse began ticking, at the latest, when it announced on January 30, 2014, "AXA Equitable will now be AXA."[96] Because AXA fails to provide evidence of a bona fide use of "EQUITABLE" as a stand-alone mark for more than a three year period, Equitable has established a *prima facie* case AXA abandoned its mark no later than early 2017.[97]

### b. Intent Not to Resume Use

Courts may infer an intent to abandon a trademark from the surrounding circumstances.[98] "Although abandonment requires both non-use and intent not to resume use of the mark, the element of intent can be established inferentially by the same facts that establish non-use."[99]

---

[93] Nos. 89–1043, 89–1048, 1990 WL 27236 (4th Cir. Feb. 23, 1990).

[94] *Id.* at *4.

[95] *See id.*

[96] Sefick Decl., Ex. 3.

[97] *See Oklahoma Beverage Co.*, 565 F.2d at 632; *Specht*, 758 F. Supp. 2d at 594.

[98] *Oklahoma Beverage Co.*, 565 F.2d at 632.

[99] *Cumulus Media, Inc.* 304 F.3d at 1174 (quoting *Vitaline Corp. v. Gen. Mills, Inc.*, 891 F.2d 273, 275 (Fed. Cir. 1989)).

Equitable points to the same facts laid out above to prove AXA's intent not to resume use of the Equitable mark:  AXA's failure to renew its trademark registrations; changing its name from The Equitable Life Assurance Society of the United States to AXA Equitable Life Insurance Company; and spending tens of millions of dollars to shorten its brand name from "AXA EQUITABLE" to "AXA."  While any one of these facts may be insufficient alone to prove an intent not to resume use, together they provide strong evidence AXA intended to abandon the "EQUITABLE" mark for good.  Indeed, few acts show a stronger intent to abandon a mark than a concerted campaign to convince consumers to stop referring to the company by its previous name.[100]

AXA put forward no evidence that it intended to continue use of the "EQUITABLE" mark during its period of nonuse, instead contending only that it never stopped using the "EQUITABLE" mark.  To be sure, AXA did not remove the word "Equitable" from its name.  But the question presented here is not whether AXA abandoned the use of "Equitable" as part of its name.  And AXA's own declarant admits AXA did not begin thinking about refreshing its branding until 2018—well after its extended period of nonuse beginning at the latest in 2014.[101]  In short, the evidence shows that by the time AXA formed an intent to resume use of the "EQUITABLE" mark, it had already abandoned the mark.

---

[100] *Id.* at 1178 n.17 (acknowledging a public announcement of a name change "is the type of circumstance from which intent not to resume may be inferred"); *see also* 3 McCarthy on Trademarks and Unfair Competition § 17:11 (5th ed.) (November 2019 Update) ("An intent not to resume use might be explicitly stated in advertising, as where a company advertises that 'We Are Changing Our Name from ALPHA to ZETA. Don't Call Us ALPHA any more.'").

[101] *See* Ferrero Decl. ¶ 50.

### c. Effect of AXA's Abandonment

Once a mark is abandoned, "it enters the public domain and another party can appropriate it."[102]  In this case, Equitable had already been using the mark for decades as a junior user. Equitable does not own a federal trademark registration for the "EQUITABLE" mark and is thus not entitled to a presumption of nationwide protection.[103]  But it has presented evidence it is licensed to sell annuities in 47 states and the District of Columbia, in addition to working with independent marketing agents and brokers nationwide.[104]  Having also employed the mark for several decades, Equitable is likely to succeed on its claim it is the senior user of the mark.[105]

### B. Commercial Use

Equitable argues this element was satisfied by AXA's announcement on December 2, 2019, that AXA was dropping the "AXA" prefix from its name and would make its new name public in January 2020.  As AXA does not contest this point, Equitable is likely to succeed on the second element of its Lanham Act Claim.

### C. Likelihood of Confusion

As noted above, actions for trademark infringement under the Lanham Act turn in significant part on whether the allegedly infringing mark will cause a likelihood of confusion.  In the Tenth Circuit likelihood of confusion is evaluated under six factors:

(1) the degree of similarity between the marks;

(2) the intent of the alleged infringer in adopting its mark;

(3) evidence of actual confusion;

---

[102] *Specht*, 758 F. Supp. 2d at 595 (citation omitted).

[103] *First Sav. Bank v. First Bank Sys., Inc.*, 101 F.3d 645, 651 (10th Cir. 1996).

[104] Acker Decl. ¶ 15.

[105] *See Sengoku Works v. RMC Int'l*, 96 F.3d 1217, 1219 (9th Cir. 1996) ("It is axiomatic in trademark law that the standard test of ownership is priority of use.").

(4) similarity of products and manner of marketing;

(5) the degree of care likely to be exercised by purchasers; and

(6) the strength or weakness of the marks.[106]

"These factors are interrelated and no one factor is dispositive."[107]  The court considers each factor in turn.

### 1.  *The Degree of Similarity Between the Marks*

The similarity of the marks is the "first and most important factor."[108]  "The degree of similarity is tested on three levels as encountered in the marketplace: sight, sound, and meaning."[109]  In examining these elements, the Court "must determine whether the allegedly infringing mark will confuse the public when singly presented, rather than when presented side by side with the protected trademark."[110]  Further, while the "dominant portion" of the marks is given greater weight, "each mark still must be considered as a whole."[111]

Before conducting its analysis, the court must answer the threshold questions of which marks to compare.  The parties have introduced several variations of their trademarks, some more similar than others.  Rather than attempt to compare each variation, the court will evaluate the two marks the parties emphasized in their papers and at oral argument.  Equitable's mark is displayed below:

---

[106] *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002).

[107] *Id.*

[108] *Hornady Manufacturing Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1001 (10th Cir. 2014).

[109] *First Sav. Bank*, 101 F.3d 645 at 653.

[110] *Sally Beauty Co.*, 304 F.3d at 972.

[111] *First Sav. Bank*, 101 F.3d at 653.



AXA intends to use the following mark:[112]



As to "sight," the dominant portions of the competing trademarks are nearly identical. Both display "EQUITABLE" in all capital letters and use a similar font. In addition, both are horizontally oriented and appear in muted colors. Considering the marks as a whole, some differences appear. AXA's mark includes an image of Athena holding a shield in a small blue circle over the word "EQUITABLE." Equitable's mark employs a multi-colored triangle to the left of the word "EQUITABLE," which is situated above the words "LIFE & CASUALTY INSURANCE COMPANY" in a much smaller and lighter font. The "Q" in Equitable's mark has a tail that protrudes through the center of the letter; the "Q" in AXA's mark employs a "hook tail." Consumers viewing the marks side by side may be unsure whether the marks belong to the same company, but when singly presented, the court finds the visual components of the marks so similar they are likely to cause confusion.

A mark's "sound" refers to pronunciation. Here, the parties do not dispute that the marks' dominant portions are pronounced the same way. Although Equitable's mark includes a few additional words that would distinguish its pronunciation, the court agrees with Equitable

---

[112] Again, the court considers the status quo to be the period immediately before AXA's January 14, 2020, public launch.

that, in general, "[independent marketing organizations and [the] consuming public are going to shorten both [parties'] names to 'Equitable.'"[113]  The evidence supports this reality: the announcement AXA sent out about its name change stated, "On January 14, 2020, we'll announce our name is Equitable"[114]—not "Equitable Financial Life Insurance Company."  And Nick Lane sent a letter introducing the change that was signed "President, Equitable."[115]

Turning to "meaning," Equitable contends "there is little to distinguish" the marks.[116]  AXA represents its mark is intended to "evoke the brand attributes of 'courage, strength and wisdom,'" which it tries to do by incorporating Athena's image and other portraits of people in profile.[117]  But consumers are unlikely to divine significant differences in the marks' meanings given that they employ the same dominant word.

AXA cites three cases from the Tenth Circuit for its proposition that this factor can weigh against infringement even where marks share a word or are identical.[118]  But none of the cases AXA relies on feature competing marks where, as here, the *dominant* portions are identical.[119]  Given that the dominant portions of the marks are visually identical, the marks will be pronounced identically, and no significant differences in meaning emerge, the court finds this important factor weighs heavily in Equitable's favor.

---

[113] Dkt. 39 (Inj. Mot.) at 15.

[114] Dkt. 53 (Opp'n) at 7.

[115] Acker Decl. ¶¶ 7–8; *id.*, Ex. 2 at 4.

[116] Dkt. 57 (Reply) at 9.

[117] Dkt. 53 (Opp'n) at 16.

[118] *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527 (10th Cir. 1994); *First Sav. Bank v. First Bank Sys., Inc.*, 101 F.3d 645 (10th Cir. 1996); *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084 (10th Cir. 1999).

[119] *See Universal Money Ctrs.*, 22 F.3d at 1531 ("UNIVERSAL MONEY" v. "Universal"); *First Sav. Bank*, 101 F.3d at 648 ("FirstBank" (horizontal) v. "First Bank SYSTEM" (vertical)); *King of the Mountain*, 185 F.3d at 1087–88 ("King of the Mountain" v. "JEEP KING OF THE MOUNTAIN DOWNHILL SERIES").

## 2. *Intent of the Alleged Infringer*

"Evidence that the alleged infringer chose a mark with the intent to copy, rather than randomly or by accident, typically supports an inference of likelihood of confusion."[120] However, "mere knowledge of a similar mark" alone is insufficient to find a party intended to copy its competitor.[121] "The proper focus remains whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff."[122]

It is obvious that AXA was aware of Equitable and its mark when AXA was developing its own "EQUITABLE" mark. Among other things, AXA was preparing and submitting registrations for the mark, and it initiated (ultimately unsuccessful) negotiations for a co-existence agreement. It nevertheless seems unlikely AXA had the intent to derive benefit from Equitable's reputation or goodwill. AXA was founded as "The Equitable Life Assurance Society of the United States." Now obligated to remove the "AXA" prefix, it was reasonable for AXA to try to resume use of its prior name. And as Equitable acknowledges, AXA has a stronger

---

[120] *Hornady Manufacturing*, 746 F.3d at 1003.

[121] *Universal Money Ctrs.*, 22 F.3d at 1532.

[122] *Id.* at 1532. In its reply, Equitable notes the intent inquiry changes, however, in so-called "reverse confusion cases" where, as here, "it is the larger entity that is the junior user and the loss of the trademark's value to the smaller, senior user is the harm." *Altira Group LLC v. Philip Morris Cos., Inc.*, 207 F. Supp. 2d 1193, 1199 (D. Colo. 2002). "[B]ecause the harm in reverse confusion cases is that [the] junior user overwhelms the senior user's name rather than trades on its goodwill, the appropriate intent inquiry is whether defendant acted carelessly or otherwise culpably in selecting the allegedly infringing name." *Id.* at 1200. The Tenth Circuit has not specifically addressed whether the intent prong should be analyzed differently in reverse confusion cases of trademark infringement under the Lanham Act. However, in a common law trademark infringement case under Colorado law, the Tenth Circuit rejected Goodyear's argument (who was the larger, but junior, user of the mark) that liability could not be imposed "without a showing that Goodyear intended to trade on the goodwill of Big O . . . ." *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1372 (10th Cir. 1977). The "logical consequence" of requiring a smaller, senior user of a mark to demonstrate the larger, junior user was trying to trade on the senior user's goodwill "would be the immunization from unfair competition liability of a company with a well established trade name and with the economic power to advertise extensively for a product name taken from a competitor." *Id.* at 1372. If the court applied this standard, it would find this factor weighs heavily in Equitable's favor. But, despite a fleeting reference in its Motion, Equitable did not style its claim as one for reverse confusion. Because Equitable first raised its reverse confusion argument in reply, the court will not consider it.

presence in the annuities space.  It would be strange to conclude AXA—the much larger annuities seller—sought to trade off a smaller competitor's goodwill.

That said, some courts find evidence of bad faith even where they conclude the defendant did not choose its mark purposely to promote confusion.  For example, in *Kos Pharmaceuticals, Inc. v. Andrx Corporation*, the Third Circuit held "[a] defendant that persisted in its plan to adopt a mark after being warned of too close resemblance between its proposed mark and plaintiff's mark is not blameless."[123]  Here, AXA—no doubt aware that another annuities company named Equitable could pose a problem to its plan to revert to its old name—reached out to Equitable in February 2019 to negotiate a co-existence agreement.  After Equitable refused to give up its rights to "EQUITABLE," those negotiations broke down, but AXA continued to pursue its name change despite knowing of Equitable's opposition.  And it persisted in its plan to adopt its new name in January in the face of this lawsuit.  In short, AXA has at a minimum been indifferent toward the harm that would likely result to Equitable's less prominent, but rapidly growing, brand recognition.  Although this factor weighs in AXA's favor, its impact is minimal.

### 3.  *Evidence of Actual Confusion*

The "best evidence" of a likelihood of confusion is actual confusion in the marketplace.[124]  Actual confusion is often established through direct (anecdotal) evidence and survey evidence.[125]

### a.  Survey Evidence

AXA correctly points out Equitable offers no survey evidence to supports its claim of actual confusion.  Equitable represented in its reply it is "in the process" of conducting a survey

---

[123] 369 F.3d 700, 721 (3d Cir. 2004).

[124] *Hornady Manufacturing*, 746 F.3d at 1004.

[125] *Id.*

to prove actual confusion, which it asserts is further reason to maintain the status quo while the parties continue to gather evidence.[126]  But AXA's proposed trademarks have been publicly available since July 2018.  Further, Equitable filed suit in September 2019, giving it ample time to conduct a survey.  This lack of survey evidence prevents the court from drawing any broad conclusions about actual confusion among consumers.

### b.   Direct Evidence

Equitable has presented limited direct evidence of actual confusion.  After receiving AXA's email announcement about its name change, Mia Smiley, Director of Contracting at Fig Marketing (an independent marketing organization), sent a colleague the following email:

> I received the below announcement that AXA will be rebranding and officially changing [its] name to Equitable come January 2020. Would you happen to know if they will have two separate contracting teams or will everything run under Equitable? Any information known about the transition would be greatly appreciated so that we can update[] our internal staff and agents.[127]

The recipient responded, "Good afternoon Mia—this is not the same company.  Axa Equitable is a variable company with no affiliation to Equitable Life & Casualty."[128]  AXA argues Ms. Smiley was not confused and that the "they" in the third line of her email refers to AXA S.A. and AXA Equitable Life Insurance Company (as opposed to AXA and Equitable).  But AXA's reading of the email exchange cannot account for the recipient's clarification that "this is not the same company."  In other words, if Ms. Smiley was not confused, the recipient was.  The court is therefore satisfied that the referenced email exchange presents evidence of actual confusion.

---

[126] Dkt. 59 (Reply) at 8 n.3.

[127] Acker Decl. ¶ 10; *id.*, Ex. 3 at 2.

[128] Acker Decl., Ex. 3 at 1.

Equitable also cites an email from Stephanie Dahl of ECA Marketing (another IMO) as evidence of actual confusion. One minute after receiving AXA's announcement email about its upcoming name change, Ms. Dahl wrote, "Well won't that be confusing."[129] AXA insists Ms. Dahl's email proves she was *not* confused and thus cannot serve as evidence of actual confusion. While the court agrees it appears Ms. Dahl was not confused about the relationship between AXA and Equitable, it is nonetheless relevant a sales agent in the annuities market anticipated AXA's name change would cause confusion. This is particularly so here where Equitable is seeking an injunction before AXA has officially changed its name.

AXA counters that the Tenth Circuit has "consistently recognized . . . that isolated, anecdotal instances of actual confusion is *de minimis* and may be disregarded in the confusion analysis."[130] But a plaintiff generally is required to show "more than isolated instances of actual confusion when (1) the trademarked product and the defendant's product are not physically similar or are not used for similar purposes, or (2) the defendant has put on its own substantial evidence demonstrating no significant actual confusion—for example, testimony from consumers stating that they were not confused."[131] Here, the parties' overlapping products—annuities—are substantially the same.[132] And AXA has put forth no affirmative evidence of lack

---

[129] Acker Decl. ¶ 8.

[130] *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1150–51 (10th Cir. 2013).

[131] *Beltronics*, 562 F.3d at 1076.

[132] As explained below, the court acknowledges but finds unpersuasive AXA's argument that AXA and Equitable sell different annuity products. Fixed and variable annuities are unquestionably different products. But AXA has not shown that the differences are sufficiently material that the broader category of "annuities" is the wrong level of generality for purposes of this analysis.

of confusion.  Still, Equitable's evidence of actual confusion is limited and thin, and on balance this factor weighs in AXA's favor.[133]

        4.    *The Relation in Use and the Manner of Marketing Between the Goods or Services Marketed by the Competing Parties*

"The greater the similarity between the [parties'] products, the greater the likelihood of confusion."[134]  This factor is typically analyzed by separately considering (1) the similarity of products and (2) the similarity in how the products are marketed.[135]

Equitable argues the parties both sell annuity products and use the same independent sales channels.[136]  AXA maintains that its products differ from Equitable's because AXA sells variable annuities and Equitable sells fixed annuities.  AXA also asserts the parties employ different marketing channels: AXA relies on its own 4,350-member affiliated sales force; Equitable uses licensed agents at independent marketing organizations.[137]

AXA cites a litany of cases to demonstrate "parties can coexist using common English words in the financial services industry where they offer different products."[138]  But this factor does not require the court to make a binary distinction of whether the products at issue are related.  That is, the parties' products need not be identical for this factor to weigh in Equitable's favor.  Here, fixed annuities and variable annuities fall under the same annuity umbrella and both

---

[133] The court notes, however, the unique timing and procedural posture of this case.  Unlike in most trademark disputes where the competing marks have co-existed in the marketplace for some time, AXA has yet to change its name.  This makes it more difficult to collect evidence of actual confusion, rendering this factor less important than it might otherwise be on a different record.

[134] *Sally Beauty Co.*, 304 F.3d at 974.

[135] *Id.*

[136] Dkt. 39 (Inj. Mot.) at 15.

[137] Dkt. 53 (Opp'n) at 22–23.

[138] *Id.* at 21.

provide vehicles for wealth management, albeit in different ways.[139]  Further, Equitable

persuasively argues fixed and variable annuities are available with many different characteristics

along a broad spectrum of annuity products.  This substantial similarity between the products

points to a greater likelihood of confusion.[140]

As for manner of marketing, AXA sent its announcement email to some of the same

marketing agencies that sell Equitable's products.  AXA may have various other channels for

selling its products, but Equitable's evidence establishes at least some overlap in the products'

marketing.  Thus, the court concludes this factor weighs strongly in Equitable's favor.

### 5. *The Degree of Care Likely to be Exercised by Consumers*

"If consumers are likely to exercise a high degree of care in purchasing a certain product,

the likelihood of confusion is reduced."[141]  Thus, "items purchased on impulse are more likely to

be confused than expensive items."[142]

AXA asserts consumer confusion is unlikely because of the sophistication of the buyers

and the brokers and sales agents who introduce consumers to the parties' products.  Equitable

responds that even a purchaser "who is extremely careful and knowledgeable about the

instrument he is buying" may still confuse companies with highly similar marks.[143]  Because

---

[139] Indeed, most consumers would probably be unable to explain the difference between a fixed and variable annuity.

[140] Besides, under the related goods doctrine, a trademark can "protect against the use of a mark on non-competing but 'related' goods—that is any good related in the minds of consumers."  *Team Tires Plus, Ltd. v. Tires Plus, Inc.*, 394 F.3d 831, 834 (10th Cir. 2005).  Even if the court agreed with AXA that variable and fixed annuities constitute different products, there can be no question they are related in the minds of consumers.

[141] *Hornady Manufacturing*, 746 F.3d at 1006.

[142] *Sally Beauty Co.*, 304 F.3d at 975.

[143] Dkt. 39 (Inj. Mot.) at 18 (quoting *Basis Int'l Ltd. v. Research in Motion Ltd.*, 827 F. Supp. 2d 1302, 1309 (D.N.M. 2011)).

Equitable and AXA would have the same name and sell the same products through the same independent sales channels, Equitable argues confusion may be presumed.[144]

Buying annuity products differs markedly from buying most goods.[145] Consumers cannot simply walk into a corner store or even go online to purchase an annuity directly. Rather, potential customers work through intermediary sales agents or brokers who explain the various financial products.[146] This process necessarily forces consumers to carefully consider their options before making a decision. And wealth management products are obviously more important to relevant consumers than routine purchases. This factor thus favors AXA.

6. <em>Strength or Weakness of the Mark</em>

"A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties."[147] Infringement of a weak trademark is less likely to cause confusion than infringement of a strong trademark.[148] In assessing the relative strength of a mark, "one must consider the two aspects of strength: (1) Conceptual Strength: the placement of the mark on the distinctiveness . . . spectrum; and (2) Commercial Strength: the marketplace recognition value of the mark."[149]

As for conceptual strength, "EQUITABLE" is suggestive—more distinctive than generic or descriptive terms, but not as distinctive as an arbitrary or fanciful mark. Because the mark is suggestive, it is "inherently distinctive" and entitled to "the greatest protection."[150] AXA rejects

---

[144] *Id.*

[145] *See* Dkt. 53, Ex. 10 (Handley Decl.) ¶¶ 11–13.

[146] *Id.*

[147] *First Sav. Bank*, 101 F.3d at 653.

[148] *See Water Pik,* 726 F.3d at 1151.

[149] *King of the Mountain*, 185 F.3d at 1093.

[150] *Donchez*, 392 F.3d at 1216.

that "EQUITABLE" is conceptually strong because of "extensive third-party use."[151]  But AXA identifies only one other insurance company that begins with the word "Equitable" ("Equitable Liability Insurance Company").[152]  No evidence has been submitted concerning whether this company sells annuities or has a national presence.  In any event, one example of another company starting its name with "Equitable" is far from extensive third-party use.

To evaluate commercial strength, courts consider "(1) the length and manner of the mark's use, (2) the nature and extent of advertising and promotion of the mark, and (3) the efforts made to promote a conscious connection, in the public's mind, between the mark and a particular product."[153]  Equitable has employed its mark for roughly 85 years and has expended considerable resources to establish goodwill in its brand.  For example, Equitable recently has dedicated 8% of its total budget on "advertising and branding, including significant hours educating independent sales agents and internal customer service representatives on the specific types of annuities products Equitable offers."[154]  This represents a substantial investment targeted to promote a conscious connection in the public's mind between Equitable and its products.  While AXA faults Equitable for failing to submit survey evidence or market research to prove it is well-known, the Wink's report Equitable introduced shows Equitable has captured 0.55% of the nationwide deferred annuities market (over $900 million in sales) in a relatively short period of time.  On balance, the court considers Equitable's mark to be moderately strong.  This factor weighs modestly in Equitable's favor.

---

[151] Dkt. 53 (Opp'n) at 25 (citing *First Sav. Bank*, 101 F.3d at 654).

[152] *See* Dkt. 53, Ex. 7 (Hirschhorn Decl.) ¶ 101.  The other three insurance companies employing "Equitable" in their names are preceded by some other word—either "Baltimore" or "Cincinnati."  *Id.*

[153] *Hornady Manufacturing*, 746 F.3d at 1007–08.

[154] Acker Decl. ¶¶ 16–17.

## 7. *Synthesis*

Weighing the six nondispositive factors together, no clear picture emerges: three factors tip in Equitable's favor; three factors support AXA. Neither do the two traditionally most important factors—similarity of the marks and evidence of actual confusion—direct a clear outcome. As to similarity, the dominant portions of the mark are nearly identical, which suggests a significant likelihood of confusion. Equitable has not made a strong showing of actual confusion, but the court is mindful that consumers have yet to be exposed to both companies operating as "Equitable" in the annuities space.

The remaining four factors are similarly split between the parties. It does not appear AXA intended to copy Equitable's mark to trade off Equitable's goodwill, and consumers exercise a high degree of care when purchasing annuities. But the products are substantially similar, and Equitable's suggestive mark is entitled to protection. At least in the judgment of the undersigned, this case presents a very close call.

Ultimately, while each side can claim three factors weigh in its favor, they do not weigh equally. As noted above, the most important factor, similarity of the marks, strongly supports Equitable. And although the strength of the mark factor weighs modestly in Equitable's favor, it has made a strong showing that the products at issue are substantially similar. Conversely, only the degree of care factor sits squarely in AXA's corner. The actual confusion and intent factors that otherwise favor AXA are mitigated by the attendant circumstances. On balance, considering all the factors and the relative strength of each, the court concludes Equitable has narrowly shown a substantial likelihood of establishing the third element of its Lanham Act claim. Accordingly, Equitable has demonstrated a substantial likelihood of success on its trademark infringement claim.

## II.    Irreparable Harm

Equitable has met its burden of showing it will suffer irreparable harm absent the court granting a preliminary injunction. "[A] plaintiff satisfies the irreparable harm requirement by demonstrating a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages."[155] This is "not an easy burden to fulfill."[156] But while pointing to "purely speculative" harm is insufficient, a showing that there is a "significant risk" of irreparable harm meets the burden.[157]

As an initial matter, the court is not persuaded by AXA's arguments concerning Equitable's alleged delay in seeking emergency relief. AXA faults Equitable for not filing its Motion sooner because Equitable has known about AXA's plan to use the "EQUITABLE" mark since February 2019. But the evidence establishes that the parties initially sought to negotiate a co-existence agreement. And even after those negotiations broke down and Equitable filed this lawsuit, Equitable did not learn until December 2, 2019, that AXA was planning to implement its name change on January 14, 2020. Equitable filed this Motion just over two weeks after learning of the January launch date. That is not an unreasonable delay under the circumstances.

Equitable identifies two categories of harm it argues qualify as irreparable. First, Equitable contends it "stands to lose control over maintaining the quality of its products and will

---

[155] *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).

[156] *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016).

[157] *RoDa Drilling*, 552 F.3d at 1210. In a prior ruling, this court held the plaintiff "must show that the harm is both 'certain and great' and 'not merely serious or substantial.'" *Aortech Int'l PLC v. Maguire*, No. 14-cv-00171, 2014 WL 12602862, at *4 (D. Utah Dec. 22, 2014) (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262–63 (10th Cir. 2004)). More recent Tenth Circuit decisions tend to employ the "significant risk" standard. *See, e.g.*, *Fish*, 840 F.3d at 751 (quoting *RoDa Drilling*'s "significant risk" standard for assessing irreparable harm). The significant risk standard comports with the Supreme Court's *Winter* decision, which clarified that courts must determine whether irreparable harm is likely—and not just possible—to occur. *See Diné*, 839 F.3d at 1282 ("In *Winter*, the Court overruled the Ninth Circuit's application of a modified preliminary injunction test under which plaintiffs who demonstrated a strong likelihood of prevailing on the merits could receive a preliminary injunction based only on a possibility, rather than a likelihood, of irreparable harm.").

potentially sustain damage to its reputation."[158]  Several courts have held that loss of control over a business's reputation and loss of goodwill can constitute irreparable harm:

> If another person infringes a trademark, that person borrows the owner's reputation, whose quality no longer lies within the owner's control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use. There is injury regardless of whether the unauthorized use to which the marks are put is a better use, the same use, or a worse use.[159]

AXA responds that Equitable "strains credulity by claiming that [its] reputation will be harmed" by being associated with AXA.[160]  But the irreparable harm is the significant risk that Equitable will lose control of its reputation.  That is, even if AXA regularly receives high reviews from customers, Equitable could still be tarnished by negative reviews or press lodged at AXA.  For example, if the companies shared the same name, a customer who has had a poor experience with AXA might tell colleagues, "Don't do business with Equitable."  Those associates may decline to do business with Equitable as a result, even though the customer was referring to AXA.  These kinds of losses are difficult—if not impossible—to quantify.

Second, Equitable argues there is a significant risk customers wanting to purchase a product from Equitable will mistakenly purchase a product from AXA.[161]  This risk is considerable, Equitable argues, as AXA intends to use "equitable.com" as its website and employ a stand-alone "EQUITABLE" mark.[162]  AXA's arguments in response are unconvincing.

---

[158] Dkt. 39 (Inj. Mot.) at 23.

[159] *Tsunami Softgoods, Inc. v. Tsunami Int'l, Inc.*, No. 2:00-cv-738, 2001 WL 670926, at *5 (D. Utah Jan. 19, 2001) (quoting Third Circuit caselaw); *see also Cent. Bancorp., Inc. v. Cent. Banco., Inc.*, 385 F. Supp. 3d 1122, 1144 (quoting *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013)) ("Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm.").

[160] Dkt. 53 (Opp'n) at 30 n.17.

[161] Dkt. 39 (Inj. Mot.) at 24.

[162] *Id.* at 23–24.

First, AXA cites Equitable's failure to introduce evidence that consumers visit websites to look for annuity products and further asserts that "[c]onsumers do not buy these products online."[163]  But even if consumers do not actually make purchases through the parties' websites, the court is persuaded potential customers regularly visit the parties' websites to inform themselves and to learn more about the parties' products.[164]

Second, AXA disputes that consumers will be confused when viewing the parties' respective websites because consumers "are used to distinguishing websites that use similar terms in their domain names."[165]  That may be.  But consumers may not know that there exist two annuity companies named Equitable.  For example, one of Equitable's customers may refer a friend to invest in annuities through her preferred company, "Equitable."  If that friend then researches "Equitable annuities" online, she may end up at AXA's website, and get in touch with one of AXA's sales agents.  That agent will not likely verify whether the consumer intended to reach Equitable instead of AXA.  This harm also does not lend itself to calculation.

### III.    Balance of Harms

Weighing the respective harms, the court concludes the threatened injury to Equitable just identified outweighs the harm the preliminary injunction may cause AXA.  Although the injunction will substantially disrupt some of AXA's plans, the harms AXA identifies either do not apply to the specific injunction the court is issuing or are self-inflicted.

First, because AXA purportedly must stop using the "AXA" prefix by September 2020, AXA maintains that preventing it from using "Equitable" without "AXA" will cause significant

---

[163] Dkt. 53 (Opp'n) at 31.

[164] Indeed, this comports with AXA's argument consumers take special care when purchasing the products at issue here.

[165] Dkt. 53 (Opp'n) at 30–31.

confusion among its customers and will force it "to find a new name that does not include 'Equitable.'"[166]  As an initial matter, the injunction is temporary: if AXA ultimately prevails in this action, it can proceed with the name change it has already selected.  And even if upcoming deadlines for obtaining regulatory approval for a new name in various states force AXA to adopt a new name now, the injunction is not so broad to prevent AXA from continuing to employ "Equitable" as part of its name.  AXA is enjoined only from immediately adopting a name that begins with "Equitable" and from using "EQUITABLE" as a stand-alone mark.  That is, AXA can continue to incorporate the word "Equitable" in its name, provided the word "Equitable" is preceded by some other word.

Second, AXA contends the injunction will impose significant harm because it would have to "unwind" the work it has done since 2018 and before this motion was filed to change its name to Equitable.[167]  This work includes spending over $50 million and already informing hundreds of thousands of financial professionals about AXA's new "Equitable" name.[168]  But courts afford little weight to self-inflicted harms when conducting the balancing inquiry.[169] AXA has known since at least February 2019 (when its counsel reached out to Equitable about negotiating a co-existence agreement)—and most likely many months earlier—that Equitable was already operating in the annuities space under the Equitable name.  From that time forward, AXA assumed the risk that it may be forced to undo any further steps taken toward changing its name to Equitable.  While AXA made efforts to negotiate a co-existence agreement, it knew those efforts might ultimately fail.  And AXA itself, faced with uncertainty, could have pursued

---

[166] *Id.* at 32.

[167] *Id.* at 33.

[168] *Id.* at 33–34.

[169] *See Mineta*, 302 F.3d at 1116 (discounting defendants' alleged harms because they were self-inflicted).

declaratory relief before investing tens of millions of dollars venturing into these uncertain waters. Instead, AXA elected to place its bet before the contested legal issue was presented or decided. In short, it chose to expend significant time and resources on the name change anyway. The court will not credit these avoidable costs in its calculus.

Third, AXA argues an injunction would be damaging to its reputation because financial professional and customers "likely would think that it had done something wrong."[170] This alleged harm seems remote. Few financial professionals—and even fewer customers—are likely to become aware of the injunction. And even if they did, AXA has not presented compelling evidence that its reputation would be accordingly harmed.

## IV. Public Interest

Granting Equitable's injunction request will not adversely affect the public interest. Indeed, trademark infringement is "inherently contrary to the public interest."[171] Temporarily pausing AXA's name change until the parties can litigate their dispute protects the public from the likely confusion that will result from two annuity companies operating under substantially similar names. To the extent AXA argues consumers should be able to recognize AXA as the same company that has served clients for decades, it is incumbent upon AXA to so educate its customers without resorting to the use of a competitor's name.

## V. Security

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongly enjoined or restrained."[172] Under this rule, courts have "wide

---

[170] Dkt. 53 (Opp'n) at 34.

[171] *Harris Research, Inc. v. Lydon*, 505 F. Supp. 2d 1161, 1169 (D. Utah 2007).

[172] Fed. R. Civ. P. 65(c).

discretion" in determining the appropriate level of security necessary to compensate a wrongfully enjoined party.[173]

After initially requesting a $200 million bond at the preliminary injunction hearing, AXA subsequently asked the court to set the bond at $19,050,000 for the costs of AXA's pre-paid media buys and notifying customers about the name change. Equitable insists AXA's potential damages related to an injunction are "of its own creation" and asks that the bond be no more than $1 million. Having considered both parties' positions and the attendant circumstances, the court finds a $10 million bond is appropriate to compensate AXA if found to be wrongly enjoined. Because the court will temporarily stay its injunction, however, Equitable is not required to post the bond until the stay expires.

## VI. Temporary Stay of the Court's Order

At the hearing, both parties represented they would seek immediate appeal of the court's ruling on the injunction if they lost. While the general rule is that only final decisions of a district court are appealable,[174] 28 U.S.C. § 1292(a)(1) establishes an exception to the general rule for interlocutory orders "granting, continuing, modifying, refusing or dissolving injunctions."[175] Moreover, "an interlocutory order expressly granting or denying injunctive relief fits squarely within the plain language of section 1292(a)(1)."[176] This dispute poses significant, complex legal issues, and the court does not make its decision lightly. The court invites review by the Tenth Circuit Court of Appeals as it sees fit. Given the serious ramifications this Order has for the parties, the court will temporarily stay for 48 hours its Order

---

[173] *RoDa Drilling Co.*, 552 F.3d at 1214 (quoting *Winnebago Tribe of Nebraska v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003)).

[174] 28 U.S.C. § 1291.

[175] *Id.* § 1292(a)(1).

[176] *Pimentel & Sons Guitar Makers, Inc. v. Pimentel*, 477 F.3d 1151, 1153 (10th Cir. 2007).

granting Equitable's requested injunction. If AXA certifies to the court within 48 hours it has filed a Notice of Appeal, the court will stay its Order for an additional fourteen (14) days to enable AXA to seek additional relief from the Tenth Circuit. Absent further order or guidance from the Tenth Circuit, the "effective date" of this Order will therefore be no later than sixteen (16) days from the date this Order is entered.

## CONCLUSION

For the reasons explained above, the court concludes Equitable has satisfied its heavy burden to obtain a preliminary injunction. If the court declined to issue the requested injunction, the harm to Equitable likely could not be undone even if it ultimately prevails in the action—which the court believes is likely. The court therefore issues the following Order:

A. Equitable's Motion[177] is GRANTED as delineated below.

B. AXA is enjoined from changing its name to "Equitable Financial Life Insurance Company" pending the resolution of the merits of this case;

C. AXA may not use the "EQUITABLE" mark or other "EQUITABLE"-formative marks without some other prefix in place of "AXA" in the marketing, branding, or selling of any of its products. This does not require AXA to alter any of its in-force policies that incorporate the word "Equitable";

D. AXA is further ordered to take the following corrective action related to its January 14, 2020, name change announcement:

1. Within seven (7) days from the effective date of this Order, certify to the court, all manners in which the name change was announced and implemented, including without limitation, print, digital, social media, television, email, letter, and any other manner;

2. Within fourteen (14) days from the effective date of this Order, notify all those informed of its name change that, until further notice, AXA will continue to be known as "AXA" and will continue to market and sell its products under the "AXA" name;

---

[177] Dkt. 39.

3. Within seven (7) days from the effective date of this Order, AXA shall remove from its website all references to the name "Equitable" without some other prefix;

4. AXA shall immediately take necessary steps to discontinue all use of the name "Equitable" without some other prefix, including removing all signature lines from emails that include the name "Equitable" without some other prefix;

5. Within twenty-one (21) days from the effective date of this Order, AXA shall certify to the court that it has complied with the corrective measures set forth in this Order.

SO ORDERED this 21st day of January 2020.

BY THE COURT:

_____

ROBERT J. SHELBY
United States Chief District Judge